1

2

3

4

5                     UNITED STATES DISTRICT COURT

6                 FOR THE EASTERN DISTRICT OF CALIFORNIA

7

8   JESUS GUTIERREZ, Jr.,                    Case No. 2:23-cv-0712-KJM-JDP (P)

9                      Petitioner,

10        v.

11  OAK SMITH,

12                     Respondent.

13

14  CHRISTOPHER VANNING JOHNSON,            Case No. 2:23-cv-0920-KJM-JDP (P)

15                     Petitioner,

16        v.

17  TRENT ALLEN,                             ORDER; FINDINGS AND
                                             RECOMMENDATIONS
18                     Respondent.

19

20

21        Petitioners, former codefendants convicted in state court of second-degree murder, have

22  both filed petitions for habeas corpus under 28 U.S.C. § 2254 in the related cases captioned

23  above.  Their petitions raise substantively similar arguments, and I address both in these findings

24  and recommendations.  Both petitioners argue that: (1) defense counsel was ineffective in failing

25  to object to the prosecutor's argument that her account of the evidence satisfied the state's

26  burden; (2) the prosecution failed to prove that Johnson did not act in perfect or imperfect self-

27  defense (and, consequently failed to prove that Gutierrez aided or abetted a homicide); and

28  (3) that, as a general matter, there was insufficient evidence to sustain their convictions.

1

*Gutierrez*, ECF No. 1 at 2-3; *Johnson*, ECF No. 1 at 2-3.  The respective respondents have answered both petitions, and both petitioners have filed traverses.  *Gutierrez*, ECF Nos. 24 & 33; *Johnson*, ECF Nos. 22 & 24.[1]  Both petitions should be denied.

## Background

I have reviewed the background summary articulated by the state appellate court on direct appeal.  It is correct, and I reproduce a portion of it here for factual context:

### Prosecution Evidence

Jordan Hendricks and Cromwell were close friends.[2]  They sold and used drugs together.  At noon on the day of the shooting, Hendricks went to Cromwell's house.  The two men took Xanax.  That evening, they went to Fairfield to sell marijuana.  Cromwell drove the car, a silver Acura with windows so tinted one could not see through them.  Hendricks rode in the passenger seat.  Both men carried firearms.

Cromwell parked the Acura near an apartment complex.  The two men got out of the car and walked around looking for a buyer.  But a buyer "never came," so the two men walked through an alley back to the Acura.  Hendricks put his gun under the passenger seat.  Cromwell drove away.

When they reached a nearby intersection, a dark car pulled up next to the Acura.  The passenger in the dark car had his upper body "hanging out the window."  He had a "gun pointed" at the Acura.  Hendricks grabbed his gun "for self-defense."  Hendricks could not remember who fired first, but he heard enough shots being fired that he decided to "shoot back."  Cromwell did not fire his gun.  Seconds later, Cromwell "got shot" in the head.  The Acura accelerated, then crashed.

Hendricks got out of the Acura, threw his gun under a parked car, and ran to a nearby house to ask for help.  The police arrived and arrested him.  Hendricks lied to the police about the incident: he claimed a man named Leon shot the gun from the Acura.  But when confronted by the police with surveillance video, Hendricks admitted Leon was not in the car and that he—not Leon—shot the gun.  Hendricks told the police that "somebody pulled up hanging out the window shooting at [him] so [he] shot back."

---

[1] Given that references are made to the docket in each of the related cases, the name of the petitioner has been added before the electronic docket citation to distinguish them.

[2] [footnote two in original text] Hendricks testified under a grant of immunity.

On cross-examination, Hendricks acknowledged that both he and Cromwell knew of Johnson.  But Hendricks denied knowing Johnson was in the dark car.  Cromwell's phone contained YouTube videos with comments about where to find a man with one leg who was "hiding."  Johnson had a prosthetic leg.

**Neighbor's Testimony**

On the night of the shooting, a woman who lived in the neighborhood saw a "handful" of people—including a man named "Chris"—hanging out by the white picket fence surrounding her front yard.  As Johnson spoke with a woman in the group, two men came out of an alley across the street.  Johnson appeared to recognize the men.  Johnson said, "'Look.  There they are.'"  He "pulled a gun out of his pants" and held it "by his side."  Johnson seemed "adrenaline excited" but not nervous or scared.  When the men walked in the other direction, Johnson put the gun away and resumed his conversation.

Minutes later, a black Chevy Impala pulled up by the fence.  A woman got out of the car and went inside a nearby house.  Then an Acura drove up, stopped at the intersection, and turned left.  Johnson seemed to recognize the people in the Acura.  He was excited, even more so than when he saw the men coming out of the alley.  He "did not appear . . . scared."  Johnson quickly got into the passenger seat of the Impala and yelled in a loud voice at the driver to "'follow the car.'"  Johnson commanded: "'Go get them.  Follow them.  Follow that car.'"

As the Impala sped away, Johnson hoisted his body onto the passenger side windowsill.  The top half of Johnson's body hung out of the passenger window.  Johnson held a gun in his hands.  Seconds later, the neighbor heard gunshots and car tires "screeching."  Then the Impala returned.  Johnson "stumbled" out of the car and yelled at the people by the fence to get inside a nearby house.  He was frantic.  At that point, the neighbor called 911.

**Police Investigation**

Police officers found Cromwell in the driver's seat of the Acura, dead.  In Cromwell's jacket pocket was a gun with a magazine filled to capacity.  Officers found shell casings in the seat, floorboard, and backseat of the Acura.  There were bullet holes in the driver's side of the car.  Nearby, police officers located the Impala.  Gutierrez was in the driver's seat.  The driver's side window was shattered.  Police found "expended shell casings on

top of the driver's side doorframe."  The front passenger window was down.

Surveillance video footage from a nearby building showed Hendricks and Cromwell walking through the alley.  Another video showed the Impala quickly overtake the Acura, pause for a few seconds, and drive away.  After watching the video, a police officer testified there were "six to eight flashes" that appeared "to be a discharge of firearms" from inside the Acura.  The video did not show the passenger side of the Impala, so the officer could not "tell if someone [was] hanging out" of the Impala or firing shots from the passenger side of that car.

In a police interview, Johnson claimed he was the victim of two shootings.  The first shooting occurred when Johnson was on the sidewalk near the white picket fence: a car "pulled up," "started shooting," then sped "away."  After the shooting, Johnson decided to leave because he thought the car "was going to come back."  He and Gutierrez got into Gutierrez's Impala.  Gutierrez drove in the same direction as the car that had shot at them.  The Impala happened to go this way, according to Johnson, because it was the route to his house.  Earlier in the interview, Johnson told police he was homeless.

Johnson described the second shooting: he said the car pulled up next to the Impala and "said stuff." Johnson could not see inside the car because the darkly-tinted windows were up.  Then Johnson felt a bullet "hit the window, hit the car."  The Impala drove away. Johnson denied having—or shooting—a gun.  But he acknowledged he would have "gunshot residue on [his] hands" from visiting "the shooting range."

**Defense Evidence**

Gutierrez testified he drove the Impala to the neighborhood where the shooting occurred and parked outside a house with a white picket fence.  Gutierrez had a gun that he hid in the Impala.  A car with "very tinted" windows drove by, slowed down, then "sped off."  As soon as the car left, Johnson "hopped in" the Impala and said, "'Did you see that?  Did you see that car?'"  Gutierrez responded, "Yes."

Johnson wanted to see "who was in the car," so he told Gutierrez to follow it.  Gutierrez followed Johnson's directions despite knowing that he would be unable to "see anybody" in the car because the windows were "so tinted."  Gutierrez did not see a gun in Johnson's hands.  The two men did not speak while they followed the car.

4

1

2
Gutierrez drove fast and "pulled up beside" the car.  Someone from the car "started shooting" and bullets "were flying" at the Impala. Gutierrez froze and tried to "take cover."  Johnson said, "'Go.  Go.  Go.  Drive off.  Drive off.'"  Before he did so, Gutierrez heard two or three gunshots that "sounded very close to [him]."  At that point, Gutierrez knew Johnson had a gun.  Gutierrez did not fire his gun. He drove away and threw his gun in the bushes.  Gutierrez lied to the police about the incident because "a lot of things were going through [his] mind and [he] didn't really know what to say and what not to say."

3

4

5

6

7

8
Johnson's girlfriend, Victoria C., was with Johnson and Gutierrez in front of the white picket fence on the day of the shooting. Victoria watched Johnson get into the Impala.  She did not see whether he had anything in his hands.  She did not see him hanging out of passenger window.[3]  Soon after Johnson and Gutierrez drove away, Victoria heard gunshots.  Then the Impala returned.  Johnson got out of the car and said, "'It just went down.'"

9

10

11

12
Johnson told Victoria to "'run into the house.'"  She ran into the backyard, where she, Johnson, and Gutierrez hid.  Johnson told Victoria that an Acura had shot at the Impala.  He did not ask Victoria to call 911; he did not tell her he acted in self-defense. Victoria acknowledged repeatedly lying to police and to a defense investigator.

13

14

15

16
A forensic scientist testified that a person hanging his torso out of the front passenger side window of the Impala would have "a high probability of getting shot."

17

18

19
*Gutierrez*, ECF No. 22-26 at 2-8.

20

21
Discussion

22
**I.     Legal Standards**

23
A federal court may grant habeas relief when a petitioner shows that his custody violates

24
federal law.  *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75

25
(2000).  Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty

26
Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition.  *See Harrington v. Richter*,

27

28
[3][footnote three in original text] A friend of Johnson's testified Johnson was not hanging out of the window of the Impala and did not have a gun in his hands.

1  562 U.S. 86, 97 (2011).  To decide a § 2254 petition, a federal court examines the decision of the

2  last state court that issued a reasoned opinion on petitioner's habeas claims.  *See Wilson v. Sellers*,

3  138 S. Ct. 1188, 1192 (2018); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003) ("Because,

4  here, neither the court of appeal nor the California Supreme Court issued a reasoned opinion on

5  the merits of this claim, we look to the trial court's decision."); *McCormick v. Adams*, 621 F.3d

6  970, 975-76 (9th Cir. 2010) (reviewing the decision of the court of appeal, which was last

7  reasoned decision of a state court); *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003) ("Because

8  the California Supreme Court denied review of Gill's habeas petition without comment, we look

9  through the unexplained California Supreme Court decision to the last reasoned decision . . . as

10  the basis for the state court's judgment.") (internal quotations omitted).

11     Under AEDPA, a petitioner may obtain relief on federal habeas claims that have been

12  "adjudicated on the merits in state court proceedings" only if the state court's adjudication

13  resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly

14  established Federal law, as determined by the Supreme Court of the United States" or (2) "based

15  on an unreasonable determination of the facts in light of the evidence presented in the State court

16  proceeding."  28 U.S.C. § 2254(d).

17    **II.**  **Analysis**

18      **a.**  **Ineffective Assistance of Counsel**

19     Petitioners argue that defense counsel was ineffective in failing to object to the

20  prosecutor's closing argument.  The state court of appeal rejected this claim:

21       Defendants contend the prosecutor erroneously argued she had
22       proven defendants' guilt because her theory of the case was
     "reasonable" and that trial counsel rendered ineffective assistance
23       by failing to object.

24       A. Background

25       During closing argument, the prosecutor urged the jury to evaluate
     the circumstantial evidence through the prism of reasonableness
26       and predicted "when you do that, you are going to find that the only
     reasonable conclusion, based off what was presented in this
27       courtroom . . . is that Mr. Johnson committed first-degree murder
     and Mr. Gutierrez aided and abetted him in that . . . murder."

28

The prosecutor described Johnson's response upon seeing the Acura: he "pulls out the gun . . . gets into Mr. Gutierrez's car, saying 'Go get them.' Mr. Gutierrez then drives in a very aggressive fashion in order to catch up, . . . , high rate of speed, wrong side of the road. What's the reasonable inference? That they were having a conversation in that vehicle about what was happening and what they needed to do and what was going to happen and what was going on. [¶] Mr. Gutierrez just all of a sudden decided that he was going to drive down the wrong side of the road at a high rate of speed, go find out—or who's in the Acura with dark-tinted windows that you can't see in. The Acura windows never came down. You could not see who was in that car. That's not reasonable. You don't do that just to see who was in a car." (Italics added.)

During his closing, Johnson's counsel acknowledged the prosecutor was "right. You can use circumstantial evidence, and you can make inferences. But you have to have some evidence upon which to base it, and you have none. You have to decide based on what evidence you have heard and through common sense." Counsel argued "within a second or two . . . is when . . . Johnson starts to fire in self-defense. . . . And the *reasonable circumstantial evidence* was that he fired more shots in the air because nothing was damaged as he traveled along" the street. (Italics added.)

Referring to the circumstantial evidence jury instruction, Johnson's counsel argued: "If you can draw two reasonable conclusions from the circumstantial evidence and one which points to innocence and one of them points to guilt, you . . . are required to conclude that the required intent was not proven. . . . [I]f you think this could have happened and if it did, he was guilty; this could have happened and if it did he was innocent, you have to [choose] the one that points toward innocence. *Unless you say that story is just not reasonable.* And I think it does all match up. All of the testimony that you heard from the witnesses that I presented to you matches up with the video evidence and common sense." (Italics added.)

Gutierrez's attorney made a similar argument: she claimed the prosecution evidence was "all circumstantial. . . . And this jury instruction tells you that if there are two different theories, *two reasonable theories* and one points to innocence, you need to find Mr. Gutierrez not guilty. And there is." (Italics added.)

On rebuttal, the prosecutor characterized defendants' version of the incident as "*not reasonable*." (Italics added.) She read the circumstantial evidence instruction to the jury and said defense counsel had failed to tell the jury that "'when considering circumstantial evidence, you must accept only reasonable

7

conclusions and reject any that are unreasonable.'" (Italics added.) The prosecutor continued, "They forgot to tell you that part because *their version is unreasonable*." Then the prosecutor asserted she had proven her case beyond a reasonable doubt. (Italics added.)[4] Defense counsel did not object during the prosecutor's closing argument.

The court instructed the jury on the prosecution's burden to prove the elements of the charged crimes beyond a reasonable doubt. (CALCRIM No. 220.) It also instructed the jury on the use of circumstantial evidence to establish intent. (CALCRIM No. 225.)

B. No Prosecutorial Error

A prosecutor commits prosecutorial error "insofar as her statements could reasonably be interpreted as suggesting to the jury [the prosecution] did not have the burden of proving every element of the crimes charged beyond a reasonable doubt." (*People v. Hill* (1998) 17 Cal.4th 800, 831, 72 Cal. Rptr. 2d 656, 952 P.2d 673, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13, 108 Cal. Rptr. 2d 409, 25 P.3d 618.) It "is error for the prosecutor to suggest that a 'reasonable' account of the evidence satisfies the prosecutor's burden of proof." (*People v. Centeno* (2014) 60 Cal.4th 659, 672, 180 Cal. Rptr. 3d 649, 338 P.3d 938 (*Centeno*).)

But it "is permissible" for a prosecutor "to argue that the jury may reject impossible or unreasonable interpretations of the evidence and so to characterize a defense theory." (*Centeno*, *supra*, 60 Cal.4th at p. 672.) It is also "permissible to urge that a jury may be convinced beyond a reasonable doubt even in the face of conflicting, incomplete, or partially inaccurate accounts. [Citations.] It is certainly proper to urge that the jury consider all the evidence before it." (*Ibid*.)

To determine whether a prosecutor has committed reversible error "in this context, we examine (1) whether it was reasonably likely that the prosecutor's statements misled the jury on reasonable doubt and (2) whether there is 'a reasonable probability that the prosecutor's argument caused one or more jurors to convict defendant based on a lesser standard than proof beyond a reasonable doubt.'" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165-1166, 274 Cal. Rptr. 3d 599, 480 P.3d 2 (Johnsen).) "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*Centeno*, *supra*, 60 Cal.4th at p. 667.)

---

[4] [Despite the indicator, no italics exist on this line in the original document.]

8

Here, the prosecutor argued circumstantial evidence—and the reasonable inferences therefrom—established defendants' guilt. She argued the relative reasonableness of the parties' competing versions of the incident and characterized defendants' version as "*not reasonable.*" (Italics added.)  Then, after reading the circumstantial evidence instruction, the prosecutor reminded the jury that it "must accept only reasonable conclusions and reject any that are *unreasonable.*'" (Italics added.)  The prosecutor did not, however, link the reasonableness of the prosecution theory to the reasonable doubt standard.  Nothing in the prosecutor's closing argument "lessened the prosecution's burden of proof." (*People v. Romero* (2008) 44 Cal.4th 386, 416, 79 Cal. Rptr. 3d 334, 187 P.3d 56.)

Defendants' reliance on *Centeno*, *supra*, 60 Cal.4th 659, is unavailing.  There, prosecutor told the jury: "'[Y]our decision has . . . to be a reasonable account. . . .  [Y]ou need to look at the entire picture, not one piece of evidence, not one witness . . . to determine if the case has been proven beyond a reasonable doubt.'" (*Id.* at p. 666.)  Then the prosecutor compared the prosecution and defense evidence and asked the jury, "'Is it reasonable to believe that the defendant is being set-up . . . or [that] he['s] good for it?  That is what is reasonable.  He's good for it.'" (*Ibid.*, italics omitted.)  Our high court held this argument conflated reasonable inferences from the evidence with the prosecution's obligation to prove guilt beyond reasonable doubt, impermissibly leaving the jury "with the impression that so long as her interpretation of the evidence was reasonable," the prosecution had met its burden.  (*Id.* at pp. 671-672.)

Here—and unlike *Centeno*—the prosecutor did not suggest the jury could find defendant guilty based on a "reasonable" account of the evidence.  (*Centeno*, *supra*, 60 Cal.4th at p. 673.)  Consistent with CALCRIM No. 225, the prosecutor urged the jury to "'accept the reasonable and reject the unreasonable'" in evaluating the circumstantial evidence before it.  (*Centeno*, at p. 673.)  A reasonable juror under the circumstances, having been instructed by the court that defendants must be acquitted unless the prosecutor proved the charge beyond a reasonable doubt, would have understood that the prosecutor was arguing that the prosecution inferences from the evidence were correct, but that it remained the jury's task to decide whether that evidence established each element of the crime beyond a reasonable doubt.

In their reply brief, defendants cite *Johnsen*, *supra*, 10 Cal.5th 1116 and *People v. Cowan* (2017) 8 Cal.App.5th 1152, 214 Cal. Rptr. 3d 576 (*Cowan*), but those cases do not assist them.  In *Johnsen*, the prosecutor erroneously told the jury "the reasonable doubt standard

requires jurors 'to point to something in the evidence that makes them have that doubt'" and "misstated the law by advising the jury that in evaluating whether a perceived doubt is reasonable, a 'juror should be able to convince his or her fellow jurors that the doubt is reasonable.'" (*Johnsen*, at p. 1166.)  In *Cowan*, the prosecutor misinformed the jury that the "presumption of innocence is 'gone' prior to the jury's deliberation" (*Cowan*, at p. 1159) and erroneously defined the reasonable doubt standard as requiring the jury to be "firmly convince[d] that guilt is the only reasonable interpretation of the evidence."  (*Id.* at p. 1161.)

This case bears no resemblance to *Johnsen* and *Cowan*.  Here, the prosecutor did not mischaracterize the reasonable doubt standard or misstate the law.  Instead, the prosecutor permissibly urged the jury to reject unreasonable conclusions when considering circumstantial evidence.  (*Centeno*, *supra*, 60 Cal.4th at p. 672; CALCRIM No. 225.)

In sum, the prosecutor did not err and, as a result, there was no reason for defense counsel to object. (*People v. Lucero* (2000) 23 Cal.4th 692, 732, 97 Cal. Rptr. 2d 871, 3 P.3d 248.)  Defendants' ineffective assistance of counsel claim fails.

C. No Prejudice

Assuming the prosecutor erred, and that defense counsel was ineffective for failing to object, defendants' claim fails because they cannot show prejudice, e.g., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland v. Washington* (1984) 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674.)  "The likelihood of a different result must be substantial, not just conceivable."  (*Harrington v. Richter* (2011) 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed. 2d 624.)  "'Surmounting Strickland's high bar is never an easy task.'"  (*Id.* at p. 105.)  Defendants have not satisfied their burden.

The court instructed the jury on the presumption of innocence, reasonable doubt, and the prosecution's burden of proof.  It also directed the jury to follow these instructions in the event of conflicting statements.  Jurors are presumed to follow the court's instructions.  (*People v. Holt* (1997) 15 Cal.4th 619, 662, 63 Cal. Rptr. 2d 782, 937 P.2d 213.)  As recited above, the evidence of defendants' guilt was strong and the evidence supporting the defense theories was comparatively weak.  Accordingly, it is not reasonably probable the result would have been different had defense counsel objected to the prosecutor's closing argument. (*Johnsen*, *supra*, 10 Cal.5th at p. 1167 [no prejudice from defense

10

1    counsel's failure to object to prosecutor's alleged error in stating
2    reasonable doubt standard].)

3   *Gutierrez*, ECF No. 22-26 at 12-18.  The California Supreme Court rejected petitioners' claims in

4   a summary denial.  *Gutierrez*, ECF No. 22-30 at 2.  Petitioner Gutierrez raised the claim again in

5   a state habeas petition, which also received summary denials.  *Gutierrez*, ECF No. 22-23 at 4,

6   ECF Nos. 22-27 at 2, 22-31 at 2.

7        "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth

8   Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the

9   'ample opportunity to meet the case of the prosecution' to which they are entitled."  *Strickland v.*

10  *Washington*, 466 U.S. 668, 685 (1984) (quoting *Adams v. United States ex rel. McCann*, 317 U.S.

11  269, 275 (1942)).  Petitioner must establish two components to succeed on a claim of ineffective

12  assistance of counsel: (1) unreasonably deficient performance, meaning that trial counsel's

13  performance "fell below an objective standard of reasonableness;" and (2) prejudice, meaning

14  that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

15  the proceeding would have been different."  *Strickland* at 688.  "The essence of an ineffective-

16  assistance claim is that counsel's unprofessional errors so upset the adversarial balance between

17  defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."

18  *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).

19       There was, as the state court found, no prejudice, and, thus, relief on this claim is

20  foreclosed.  The appellate court's application of *Strickland* is entitled to deference from this court,

21  and a finding to the contrary is warranted only if the state court's decision was unreasonable.  *See*

22  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) ("The question is not whether a federal court

23  believes the state court's determination under the *Strickland* standard was incorrect but whether

24  that determination was unreasonable—a substantially higher threshold.") (internal quotation

25  marks omitted).  A state court's decision is unreasonable only if no reasonable jurist could agree

26  with it.  *See Chavez v. Brnovich*, 42 F.4th 1091, 1101 (9th Cir. 2022) ("To conclude that the state

27  court decision was objectively unreasonable, we must find that no fairminded jurist could agree

28  with the state court's decision.").  Here, the appellate court reasonably determined that, even if

11

1  the prosecutor erred, petitioners were not prejudiced because the jurors were properly instructed

2  as to the prosecution's burden, reasonable doubt, and the presumption of innocence.  *Gutierrez*,

3  ECF No. 22-1 at 185.  As the state court noted, jurors are presumed to follow their instructions.

4  *Penry v. Johnson*, 532 U.S. 782, 799 (2001).  A fairminded jurist could agree with this holding

5  and petitioners are entitled to no relief on this claim.

6           **b.      Johnson's Theory of Self Defense**

7           Petitioner Johnson contends that there was insufficient evidence to prove, beyond a

8  reasonable doubt, that he did not act in self-defense and to sustain a homicide or murder

9  conviction against him.  *Johnson*, ECF No. 1 at 31-32.  The state court of appeal rejected this

10  claim:

11           Substantial Evidence Supports the Jury's Implied Finding that
12           Johnson Did Not Act in Self-Defense

13           "When a defendant challenges the sufficiency of the evidence for a
         jury finding, we review the entire record in the light most favorable
14           to the judgment of the trial court.  We evaluate whether substantial
         evidence, defined as reasonable and credible evidence of solid
15           value, has been disclosed, permitting the trier of fact to find guilt
         beyond a reasonable doubt.  [Citation.]  "'The standard of review is
16           the same in cases in which the prosecution relies mainly on
         circumstantial evidence.'"'  (*People v. Vargas* (2020) 9 Cal.5th
17           793, 820, 265 Cal. Rptr. 3d 604, 468 P.3d 1121.)  Under this
         standard of review, reversal is not warranted "unless it appears "that
18           upon no hypothesis whatever is there sufficient substantial evidence
         to support'" the conviction.  (*People v. Bolin* (1998) 18 Cal.4th 297,
19           331, 75 Cal. Rptr. 2d 412, 956 P.2d 374.)

20           When self-defense is at issue, the prosecution bears the burden of
21           proving beyond a reasonable doubt that the defendant acted without
         justification.  (*People v. Rios* (2000) 23 Cal.4th 450, 462, 97 Cal.
22           Rptr. 2d 512, 2 P.3d 1066; *People v. Lloyd* (2015) 236 Cal. App.
         4th 49, 63, 186 Cal. Rptr. 3d 245.)  Perfect self-defense—a
23           complete defense to murder—requires the defendant to have an
24           actual and objectively reasonable belief that bodily injury is about
         to be inflicted on the defendant.  (*People v. Humphrey* (1996) 13
25           Cal.4th 1073, 1082, 56 Cal. Rptr. 2d 142, 921 P.2d 1.)  "The threat
         of bodily injury must be imminent."  (*People v. Minifie* (1996) 13
26           Cal.4th 1055, 1064, 56 Cal. Rptr. 2d 133, 920 P.2d 1337.)  "Fear of
27           future harm-no matter how great the fear and no matter how great

28

the likelihood of the harm-will not suffice." (*Humphrey*, at p. 1082.)

Moreover, it "is well established that the ordinary self-defense doctrine—applicable when a defendant reasonably believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack . . . is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1, 30 Cal. Rptr. 2d 33, 872 P.2d 574.)

Defendants contend the prosecution failed to prove beyond a reasonable doubt that Johnson did not act in self-defense. But in finding defendants guilty of second degree murder, the jury impliedly found otherwise and substantial evidence supports that finding. A neighbor testified Johnson seemed "adrenaline excited" when he saw Hendricks and Cromwell emerge from the alley. When Johnson saw the two men, he retrieved a gun and held it by his side. Later, when Hendricks and Cromwell drove by, Johnson got "more excited." At no point did Johnson seem afraid. Johnson yelled at Gutierrez to "'get'" the men and to "'follow'" their car. He quickly got into the Impala. As the Impala sped away, Johnson hung out of the window, holding a gun in his hand.

Hendricks testified a dark car pulled alongside the Acura. A man— Johnson—was hanging out of the car's window "shooting at [him]." Hendricks heard enough shots being fired that he decided to "shoot back." Surveillance video footage showed the Impala aggressively overtaking the Acura, pausing briefly during the gunfight, and driving away. When interviewed by police, Johnson gave no indication he feared imminent harm "that could be met only through the use of deadly force." (*People v. Steskal* (2021) 11 Cal.5th 332, *15.)

Considered together, this evidence easily supports a conclusion that defendants sought out Hendricks and Cromwell and initiated the confrontation that ended in Cromwell's death. (*People v. Steskal*, supra, 11 Cal.5th at *15 [circumstances of the crime indicated the defendant was the aggressor, "not the other way around"]; *People v. Salazar* (2016) 63 Cal.4th 214, 244, 202 Cal. Rptr. 3d 638, 371 P.3d 161 [ample evidence established the defendant initiated the assault and supported jury's rejection of his self-defense claim].) This evidence also supports a reasonable inference that Johnson did not fear imminent harm when he directed Gutierrez to go "'get'" the two men. (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1018, 232 Cal. Rptr. 3d 220 ["there was sufficient evidence for the jury to reject [the defendant's] claim of self-defense based on a lack of

objective reasonableness"]; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1044, 191 Cal. Rptr. 3d 182, 354 P.3d 90 [jury could reasonably conclude the defendant "did not act on the basis of fear alone but also on a desire to kill his rival"].)

Defendants' argument to the contrary is premised on a recitation of the evidence favoring them. This strategy—an improper request to reweigh the evidence and reevaluate the credibility of witnesses—is unavailing. It "'is the jury, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt.'" [Citations.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358, 75 Cal. Rptr. 3d 289, 181 P.3d 105,) Here, the evidence supports the jury's rejection of Johnson's self-defense claim.[5]

*Johnson*, ECF No. 20-26 at 8-10. The California Supreme Court later rejected this claim in a summary denial. *Johnson*, ECF No. 20-30 at 2.

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). He must show that, after viewing the evidence in the light most favorable to the prosecution, "no rational trier of fact could find guilt beyond a reasonable doubt[.]" *Jackson v. Virginia*, 443 U.S. 307, 317 (1979). In addition, the state court's decision applying *Jackson* is entitled to a high level of deference and this court may find in petitioner's favor only if it concludes that the state court's application was unreasonable. *Juan H.*, 408 F.3d. at 1274-75. Here, as the state court reasonably concluded, there was substantial evidence contradicting a theory of self-defense. Witness testimony indicated that Johnson urged Gutierrez to follow the victim's car and then prepared to fire at them from the passenger side window. *Johnson*, ECF No. 20-10 at 139-40, 189-90. It bears reiterating that it is not for this court to reweigh the evidence; that was the jury's task. The only question is whether,

---

[5] [footnote 4 in original text] Having reached this result, we need not address Gutierrez's argument that he is not liable for murder as an aider and abettor because Johnson acted in self-defense.

14

1   in a light most favorable to the prosecution, a reasonable finder of fact could find that, beyond a

2   reasonable doubt, Johnson did not act in self-defense.  That question is answered in the

3   affirmative and this claim should be rejected.  In so doing and, as the state appellate court did

4   before, I conclude that this finding also precludes Gutierrez's argument that he is not liable as an

5   aider and abettor because Johnson acted in self-defense.

6           **c.**     **Sufficient Evidence to Sustain Gutierrez's Conviction**

7         Separately, Gutierrez argues that, even if there was sufficient evidence to find that

8   Johnson did not act in self-defense, there was still not enough evidence to convict him aiding and

9   abetting the homicide.  *Gutierrez*, ECF No. 1 at 33-34.  The state appellate court rejected this

10  claim:

11
12      Gutierrez claims he was unaware Johnson intended to kill
    Cromwell and, as a result, insufficient evidence establishes he aided
    and abetted the murder.

13
14      "Second degree murder is the unlawful killing of a human being
    with malice aforethought but without the additional elements, such
15  as willfulness, premeditation, and deliberation, that would support a
    conviction of first degree murder." (*People v. Knoller* (2007) 41
16  Cal.4th 139, 151, 59 Cal. Rptr. 3d 157, 158 P.3d 731.)  Malice
    "'may be either express or implied. It is express when there is
17  manifested a deliberate intention to take away the life of a fellow
    creature.  It is implied, when no considerable provocation appears,
18  or when the circumstances attending the killing show an abandoned
    and malignant heart.'" (*Id.* at p. 151.)
19
20      "[A] person aids and abets the commission of a crime when he . . . ,
    acting with (1) knowledge of the unlawful purpose of the
21  perpetrator; and (2) the intent or purpose of committing,
    encouraging, or facilitating the commission of the offense, (3) by
22  act or advice aids, promotes, encourages or instigates, the
    commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d
23  547, 561, 199 Cal. Rptr. 60, 674 P.2d 1318.)  In a murder
    prosecution, this means "the aider and abettor must know and share
24  the murderous intent of the actual perpetrator." (*People v. McCoy*
    (2001) 25 Cal.4th 1111, 1118, 108 Cal. Rptr. 2d 188, 24 P.3d
25  1210.)  But "the aider and abettor need not have advance
    knowledge of the crime or the perpetrator's intent.  'Aiding and
26  abetting may be committed "on the spur of the moment," that is, as
    instantaneously as the criminal act itself.'" (*People v. Frandsen*
27  (2019) 33 Cal. App. 5th 1126, 1148, 245 Cal. Rptr. 3d 658.)

28

1

2

3

4

5

6

7

8

9

10

11

> Here, substantial evidence supports a reasonable inference that Gutierrez—with knowledge of Johnson's murderous intent—offered support and encouragement to Johnson, thereby aiding and abetting the murder. When Johnson saw the Acura, he got into Gutierrez's car. Armed with a gun, Johnson yelled at Gutierrez to "'follow'" the car and to "'get'" Hendricks and Cromwell. Gutierrez followed Johnson's directions: he chased after the Acura and pulled up alongside it. Before driving away, Gutierrez waited while Johnson shot at the Acura. Nothing suggests Gutierrez was surprised by, or afraid to interfere with, Johnson's actions. (*People v. Campbell* (1994) 25 Cal. App. 4th 402, 409, 30 Cal. Rptr. 2d 525.) After the shootout, Gutierrez discarded his own weapon and hid. (*People v. Hoang* (2006) 145 Cal. App. 4th 264, 270, 51 Cal. Rptr. 3d 509 [the defendant's actions after the crime consistent with aiding and abetting].) Together, this evidence adequately demonstrates Gutierrez's "awareness and complicity in [the] killing." (*People v. Quiroz* (2013) 215 Cal. App. 4th 65, 76, 155 Cal. Rptr. 3d 200.)

12    *Gutierrez*, ECF No. 22-26 at 11-12. The California Supreme Court rejected this claim in a

13    summary denial. *Gutierrez*, ECF No. 22-27 at 2.

14         The same *Jackson* standard set forth in the previous claim applies here and, as before,

15    there was sufficient evidence to uphold petitioner's conviction for aiding and abetting. As the

16    state court described, testimony indicated that Gutierrez followed Johnson's directives to follow

17    and 'get' the victim's car and offered driving aid to the gunman while he fired at the other

18    vehicle. *Gutierrez*, ECF No. 22-10 at 139-42, 189-92. This testimony was sufficient evidence for

19    a rational finder of fact to determine that Gutierrez aided and abetted Johnson in the murder.

20         Accordingly, it is ORDERED that the Clerk of Court shall file a copy of these findings

21    and recommendations in each of the cases set out in the caption of this order and

22    recommendations.

23         Further, it is RECOMMENDED that both habeas petitions in the above captioned cases be

24    DENIED.

25         These findings and recommendations are submitted to the United States District Judge

26    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days

27    of service of these findings and recommendations, any party may file written objections with the

28    court and serve a copy on all parties. Any such document should be captioned "Objections to

1   Magistrate Judge's Findings and Recommendations," and any response shall be served and filed

2   within fourteen days of service of the objections.  The parties are advised that failure to file

3   objections within the specified time may waive the right to appeal the District Court's order.  *See*

4   *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

5   1991).

6

7   IT IS SO ORDERED.

8

9   Dated:    July 29, 2025

    JEREMY D. PETERSON
10  UNITED STATES MAGISTRATE JUDGE